[Civ. No. 12902. First Dist., Div. One. July 30, 1945.]

BETHLEHEM STEEL COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and DANIEL E. SEAQUIST, Respondents.

R. P. Wisecarver for Petitioner.

Everett A. Corten and R. C. McKellips for Respondents.

KNIGHT, J.—On October 17, 1944, Daniel E. Seaquist, employed as a machinist by the Bethlehem Steel Company at its Twentieth Street shipbuilding plant in San Francisco, tripped and fell on a cement walk, fracturing his kneecap. He was 61 years old and had been in the employ of the company two years. On October 23, 1944, he filed an application with the Industrial Accident Commission for compensation, which the company contested upon the grounds that Seaquist's injuries did not arise out of and in the course of his employment, and that he failed to give notice of claim of an industrial injury. A hearing was had and findings were made adverse to the company on both of the foregoing issues. Accordingly, an award was entered in favor of Seaquist, which the company now seeks to have annulled upon the ground that the commission acted without and in excess of its jurisdiction, the points urged in this behalf being that the evidence does not justify the findings of fact, and that the findings of fact do not support the award.

The accident occurred about 3:30 p. m., on land belonging to the company, contiguous to the enclosed plant yard, a few minutes after Seaquist had checked out from work at the nearby main plant gate. Earlier that day he had received a card from the company stating that a war savings bond, for which he had subscribed through the company under the wage-withholding plan, was ready for delivery, and instructing him to call for the bond at a certain window in Building No. 54, located on the land on which the accident occurred. The building had been constructed and, with the exception of the ground floor, was being used by the United States Navy as a Navy Facility. The ground floor was used by the company in carrying on the bond sales transactions with its employees.

Following the instructions given by the card, Seaquist called for the bond and after receiving it started to walk away, but in doing so he tripped and fell on a raised cement walk laid along the outside of the building and beneath the outside windows thereof through which the company was delivering the bonds.

The legal conclusions upon which the commission based its decision were: That the premises upon which the injury occurred were part of the premises of employment; that although Seaquist had discontinued his regular work and was on his way home, he had not left the premises of employment at the time of injury; that "the operations in which the employee was engaged at the time of the injury, namely, the withdrawing of a bond, payment for which was withheld from the wages due applicant [Seaquist], were a part of the total operations of the defendant in its capacity as employer"; that at the time of the injury Seaquist was performing a service growing out of and incidental to the employment, and that therefore the injuries received were compensable.

The basis of the argument advanced by the company in support of its position that Seaquist's injury did not arise out of and in the course of his employment is that in calling for the bond Seaquist was engaged in a strictly personal mission having no connection whatever with his employment; and that since the accident occurred outside of the plant, after Seaquist had checked out from work and was on his way home, the case does not fall within any of the exceptions to the general so-called "going and coming" rule. It is our opinion that the argument so advanced is not sustainable.

In addition to the facts above stated, the record discloses the following: The plan under which the bonds were purchased had its origin in the United States Treasury Department. In carrying out such plan the company requested all of its employees to purchase war bonds through the company by authorizing the company to withhold from their wages certain sums in payment of the bonds; and to that end the company distributed among its employees a printed form of authorization to be signed by them. When the bonds were ready for delivery, the company placed a printed form of notice to that effect in the employee's time box at the plant, instructing him to call for the bonds at a certain window in "Building No. 54"; and the bonds were there delivered by the company to

its employees. Prior to July 14, 1944, Seaquist had purchased some bonds under the above plan, but later had cancelled his subscription. Shortly thereafter he was told by his foreman that they "would like to get" him "on the list again"; and on July 14, 1944, he complied with such request by signing one of the printed forms of authorization, which read in part as follows: "This authorization is given pursuant to the War Savings Plan dated Aug. 1, 1941, of Bethlehem Steel Corporation and Subsidiary Companies, a copy of which I have received, and is to remain in effect until canceled by me in writing." On the day of the accident, the company placed in Seaquist's time box the printed notice that his bond was ready and instructing him to call for it at a specified window "at Building No. 54." The notice further stated: "BRING THIS CARD WITH YOU. Bonds not called for within one week of receipt of this card will be delivered at window No. 7 [a different window]. Bonds not called for within 30 days will be mailed to bond owner." The company's name appeared in print at the bottom of the notice, and Seaquist was following the instructions thus given when he was injured.

As to the location of Building No. 54, the record shows that it was built on the southerly portion of a block of land belonging to the company lying on the southerly side of Twentieth Street, contiguous to the plant yard and opposite the company's offices. There was a fence between the block and the plant yard; and the larger portion of the block, fronting on Twentieth Street, was utilized by the company as a parking lot. It was enclosed by some sort of a single rail fence, or ropes or chains, and the entrance thereto was on Twentieth Street, only a short distance from the main plant yard gate at the end of Twentieth Street, through which the company's employees checked when going to and from work. The windows of the building through which the bonds were delivered to the employees were cut through the northerly side wall of the building facing the parking lot, and beneath the windows there was laid a raised cement walk. It was thus arranged so as to make it unnecessary for the employees to enter the building to obtain delivery of their bonds, and sometimes there were as many as 100 employees lined up in front of the windows for such purpose. On the day of the accident, Seaquist, after checking out from work through the Twentieth Street gate, walked a few feet along Twentieth Street to the gateway of the parking lot and then across the parking lot

to the windows of Building No. 54, where the accident occurred.

It is well settled that the power of a reviewing court to annul the action of the Industrial Accident Commission in the exercise of its jurisdiction under the Workmen's Compensation Law is limited, and one of the fundamental rules of limitation is that if the specific findings have support in the evidence and such findings, with the aid of fair inferences drawn therefrom, sustain the commission's conclusions as to ultimate facts, its decision will not be overthrown; and where two opposing conclusions may be drawn from the facts found, the one accepted by the commission is controlling, provided, of course, it is reasonable and there is evidence in the record to support it. (27 Cal.Jur. 579-580.) Moreover, it is declared both by legislative enactment and judicial decisions that the Workmen's Compensation Law is to be liberally construed in favor of jurisdiction in the commission with the purpose of extending the benefits of the act for the protection of persons injured in the course of their employment (Lab. Code, § 3202; *Fenton* v. *Industrial Acc. Com.*, 44 Cal.App.2d 379 [112 P.2d 763]); and to this end it is held to be the duty of the courts to indulge in all reasonable inferences to support the commission's findings (*Hatheway* v. *Industrial Acc. Com.*, 13 Cal.2d 377 [90 P.2d 68]), and that any reasonable doubt should be resolved in favor of the employee (*Employers' etc. Corp.* v. *Industrial Acc. Com.*, 37 Cal.App.2d 567 [99 P.2d 1089]; *Western Pipe etc. Co.* v. *Industrial Acc. Com.*, 49 Cal.App.2d 108 [121 P.2d 35]). Applying the foregoing rules to the situation here presented, it is quite certain that any interference with the commission's ultimate conclusion on the main issue would be unwarranted.

As was said in *Employers' etc. Corp.* v. *Industrial Acc.Com.*, *supra*, and later quoted with approval in *Western Pipe etc. Co.* v. *Industrial Acc. Com.*, *supra* (p. 573): "If the particular act is reasonably contemplated by the employment, injuries received while performing it arise out of the employment, and are compensable. In determining whether a particular act is reasonably contemplated by the employment the nature of the act, the nature of the employment, the custom and usage of a particular employment, the terms of the contract of employment, and perhaps other factors should be considered. Any reasonable doubt as to whether

the act is contemplated by the employment, in view of this state's policy of liberal construction in favor of the employee, should be resolved in favor of the employee.'' ▮ Here, the commission found, and the evidence shows, that the bond sales operations carried on between the company and its employees were part of the total operations of the company in its capacity as employer; and the evidence further shows that although Seaquist had checked out from work at the plant yard, the particular act in which he was engaged at the time he was injured, namely, calling for a bond which was to be delivered to him in lieu of part of his wages, was in furtherance of such operations and must have been reasonably contemplated by his employer, because the company had notified him to call for the bond within a week at the particular place on the company's premises where he sustained the injury. There is no evidence showing that the employees were permitted to pick up the bonds during working hours.

Aside, however, from the tests set forth in that portion of the decision last above quoted, there are many exceptions to the ''going and coming'' rule, and, as was said in *Western Pipe etc. Co.* v. *Industrial Acc. Com.*, 49 Cal.App.2d 108, at page 111 [121 P.2d 35], the scope of those exceptions has been considerably broadened recently by the Supreme Court in the cases of *Freire* v. *Matson Navigation Co.*, 19 Cal.2d 8 [118 P.2d 809], and *Smith* v. *Industrial Acc. Com.*, 18 Cal.2d 843 [118 P.2d 6]. In those cases and also in the case of *California Casualty Indemnity Exchange* v. *Industrial Acc. Com.*, 21 Cal.2d 751 [135 P.2d 158], it was held that because of the factual situations there presented they were taken out of the operation of the general ''going and coming'' rule; and those cases cite and review many others, both from within and from without this jurisdiction, wherein it was held likewise, that because of the presence of special facts the general rule was not applicable thereto. Naturally no two of those cases rested on the same state of facts, and consequently it cannot be said that factually any one of them is in point here. ▮ However, two legal principles are emphasized therein: that the term ''employment'' includes not only the doing of the work, but a reasonable margin of time and space necessary to be used in passing to and from the place where the work is done; ▮ and that the rule that the employee must be rendering service for the employer at the time of the injury is not of

inevitable application. And it is our opinion that the reasoning of those cases fully sustains the conclusion adopted in the present case by the referee and the commission, that the injuries here arose out of and in the course of Seaquist's employment.

 The company's second major point is likewise without merit. It is contended that it received no notice of the injury and that therefore Seaquist was not entitled to reimbursement for medical expenses.

The pertinent provisions of the Labor Code are as follows: Section 4600 provides that medical attention which is reasonably required to cure or relieve from the effect of injury to the employee shall be provided by the employer, and that ''In the case of his neglect or refusal seasonably to do so, the employer is liable for the reasonable expense incurred by or on behalf of the employee in providing treatment.'' Section 5400 provides: ''Except as provided by sections 5402 and 5403, no claim to recover compensation . . . shall be maintained unless within thirty days after the occurrence of the injury which is claimed to have caused the disability or death, there is served upon the employer notice in writing, signed by the person injured, or someone in his behalf. . . .'' And section 5402 provides that ''Knowledge of such injury, obtained from any source, on the part of an employer, his managing agent, superintendent, foreman, or other person in authority, or knowledge of the assertion of a claim of injury sufficient to afford opportunity to the employer to make an investigation into the facts, is equivalent to service under section 5400.'' In 27 California Jurisprudence, at page 528, the law governing the matter of the payment of medical expenses is stated as follows: ''In every case the employer should be given a fair opportunity to furnish to the employee the treatment required on account of the injury or to substitute his own treatment for that procured. Obviously, in order that he be given such an opportunity, the notice or knowledge of the injury must be such as to afford a reasonable notification of the need of medical treatment or claim thereto on account of the injury.'' But it is then said: ''However, even though he first becomes aware of the necessity for treatment at the time the employee is being treated by a physician of his own choice, the employer is obliged then to tender treatment else he becomes liable for the value of services rendered thereafter.''

In the present case the facts are these: At the time Seaquist fell he suffered immediate and severe pain, but he did not realize the seriousness of the injury he had received, and he went on home. Later he called his personal physician, who found the kneecap fractured and placed Seaquist in a private hospital, where the fracture was reduced and the knee placed in a cast. He remained in the hospital thirteen days. On the day following the accident, Seaquist's daughter phoned to the foreman under whom Seaquist was working that her father had been injured, and three days later Seaquist's wife went to the plant yard and personally notified the company of her husband's injury. At that time the company's representative with whom she talked said nothing "one way or the other what they were going to do"; and shortly after her visit to the plant Mrs. Seaquist received a phone call to the effect that the company denied liability; and on October 23, 1944, which, as will be noted, was six days after the accident and while Seaquist was still in the hospital, he filed his application for compensation with the commission.

In view of the foregoing facts, showing definitely that the company was twice notified of the happening of the accident, to wit, on the next day after it happened and again three days later, and that after having been so notified it denied liability, the company was clearly responsible for the payment of the medical expenses incurred by Seaquist in the treatment of his injury.

The award is affirmed.

Peters, P. J., concurred.

WARD, J.—I dissent. The referee found the following: "Under ordinary circumstances, the applicant would leave the ship building yard through a gate at 20th and Illinois Streets without being required to go through the building where he picked up his bond and sustained his injury, or to enter the lot where the building stood. . . . The land on which the bonds were handed out was located so that if the applicant were to leave the premises of employment in order to go home and had no personal occasion to enter the land or building in question, he would in no way pass through the building or over the lot where it stood. . . .

"The Bethlehem Steel Company handled the bookkeeping and clerical work involved in deducting the purchase price

of the bonds from the payroll and the handing out of the bonds at the proper time . . . doing so as an accommodation to the workmen in their employ . . . and the employees took advantage of this machinery for purchasing war bonds and receiving their bonds, not as a necessary element of their hiring, but as a part of the mutual undertaking to promote the loan to the Government represented by the bonds.''

It is also in evidence that the building from which the bonds were delivered was not a part of Bethlehem Steel Company's plant directly, but a building erected for Naval facilities, the whole of the second floor being so occupied, and the handing out of bonds was done there solely to accommodate employees of Bethlehem and not as a part of the shipbuilding operations, nor in furtherance of such operations.

Where such facts as these are found, no exception to the going and coming rule can be implied. This is not a case where the personal errand of the employee is in furtherance of the employer's business, such as washing hands, nor is it a case where the employee is using the only or usual means of egress from or ingress to the employer's plant. The employer in carrying out an accommodation for its employees and for the government cannot be held to an extension of the time of the employment relationship so as to create liability under the Workmen's Compensation Act when the relationship of employer and employee has ceased for the day and the employee is not on the premises of the employer for any other purpose than his own benefit.

Petitioner's application for a hearing by the Supreme Court was denied September 27, 1945.